ACCEPTED
01-14-00537-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/30/2014 4:45:34 PM
CHRISTOPHER PRIN[E]
CLERK

No. 01-14-00537-CV

_____

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
12/30/2014 4:45:34 PM
CHRISTOPHER A. PRINE
Clerk

FRANCIE WILLIS,
Appellant,

v.

BPMT, LLC,
Appellee.

_____

APPELLANT'S REPLY BRIEF

_____

On Appeal from the 164th Judicial District Court, Harris County, Texas
Hon. Alexandra Smoots-Hogan, presiding
Cause No. 2010-49638

_____

Jane Langdell Robinson, State Bar No. 24062970
Tiffany Joudi, State Bar No. 24065479
Reed N. Smith, State Bar No. 24067875
AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING
1221 McKinney Street
Houston, Texas 77010
Telephone:  (713) 655-1101
Facsimile:   (713) 655-0062
jrobinson@azalaw.com
tjoudi@azalaw.com
rsmith@azalaw.com

*Counsel for Appellant*

*Oral Argument Requested*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...............................................................................2

INDEX OF AUTHORITIES........................................................................4

INDEX OF RECORD REFERENCES...................................................7

RESPONSE TO APPELLEE'S STATEMENT OF FACTS...........................8

ARGUMENT..............................................................................................9

    I. **BPMT's reliance on *Taylor* and *Seay* to support its definition of "debt" is misplaced.  (Response to Appellee's Brief, part I-A.) ........................9**

        A.    BPMT fails to address the fact that Section 171.255 is a penal statute that must be interpreted strictly against liability.............................9

        B.    The *Taylor* court recognized that *but for* the passage of Section 171.109 (now repealed), it would have come out the other way ...10

        C.    Not only did *Seay* interpret an entirely different statute, but the legislature rejected and repealed *Seay's* interpretation of the word "debt" ..........................................................................................11

        D.    *Levy v. Hunt*, *Cain v. State*, and *Ballard v. Quinn* likewise do not support BPMT's argument regarding the meaning of "debt" in this case ..........................................................................................14

        E.    BPMT's argument that the debt was unliquidated because of the lease's mitigation clause demonstrates one of the significant negative consequences of a ruling in BPMT's favor.....................16

    II. **BPMT does not show any reason why this Court should ignore the repeal of Section 171.109.  (Response to Appellee's Brief, part I-B.)19**

    III.  **BPMT does not provide any persuasive reason why this Court should apply a definition of "debt" that has twice been rejected by the Texas Legislature.  (Response to Appellee's Brief, part I-C.)........................20**

A.      BPMT's argument that all contracts payable after forfeiture of a corporate charter are subject to Section 171.255 is contradicted by decades of Texas case law..............................................................20

B.      It is possible to give meaning to both "create" and "incur" without mandating liability in this case.....................................................22

**IV.   Contrary to BPMT's argument, the Tax Code does not create individual liability in corporate officers for their employers' franchise taxes.  (Response to Appellee's Brief, part I-D.)................25**

A.      BPMT adds nothing new to its assertion regarding pre-existing contractual obligations; the case law still holds that officers are only liable for debts contracted *after* forfeiture. ...........................25

B.      BPMT cannot rely—implicitly or otherwise—on an alter ego theory of liability against Ms. Willis because BPMT did not plead such a theory nor did it offer it in support of its motion for summary judgment...................................................................................27

C.      The rule that this Court applies in this case will be the rule that governs the liability of innocent corporate officers under Section 171.255. ...................................................................................31

**V. Francie Willis cannot be vicariously liable for debt—including attorneys' fees—on which Urban Retreat is not liable.  (Response to Appellee's Brief, part II.)........................................................32**

**CONCLUSION AND PRAYER ...............................................................34**

**CERTIFICATE OF SERVICE ................................................................35**

**CERTIFICATE OF COMPLIANCE ......................................................36**

# INDEX OF AUTHORITIES

**Cases**

*Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*,
948 S.W.2d 293 (Tex. 1997) ......................................................................18

*Ballard v. Quinn*,
14-97-01057-CV, 1998 WL 787558 (Tex. App.—Houston [14th Dist.]
Sep. 10, 1998, no pet.) .............................................. 15, 16, 22, 26

*Beesley v. Hydrocarbon Separation, Inc.*,
358 S.W.3d 415 (Tex. App.—Dallas 2012, no pet.) .....................................21

*Cain v. State*,
882 S.W.2d 515 (Tex. App.—Austin 1994, no writ) ............................. 14, 15

*Davis v. State*,
846 S.W.2d 564 (Tex. App.—Austin 1993, no writ.) .................................24

*Fleming & Assoc., L.L.P. v. Barton*,
425 S.W.3d 560 (Tex. App.—Houston [14th Dist.] 2014,
pet. filed) ......................................................................................9, 33

*Jonnet v. State*,
877 S.W.2d 520 (Tex. App.—Austin 1994, writ denied) ...................... 14, 15

*Levy v. Hunt*, 14-00-00549-CV, 2001 WL 306149
(Tex. App.—Houston [14th Dist.] 2001, no pet.) .........................................14

*McConnell v. Southside Indep. Sch. Dist.*,
858 S.W.2d 337 (Tex. 1993) ...................................... 9, 28, 29, 33

*McKinney v. Anderson*,
734 S.W.2d 173 (Tex. App.—Houston [1st Dist.] 1987,
no writ).......................................................................... 10, 21

*PACCAR Fin. Corp. v. Potter*,
239 S.W.3d 879 (Tex. App.—Dallas 2007, no pet.) .....................................23

*Pace Corp. v. Jackson*,
  155 Tex. 179, 284 S.W.2d 340 (1955) .........................................................31

*Palmer v. Coble Wall Trust Co., Inc.*,
  851 S.W.2d 178 (Tex. 1992) ......................................................................13

*Pearson v. K-Mart*, 755 S.W.2d 217
  (Tex. App.—Houston [1st Dist] 1988, no writ) ...........................................13

*River Oaks Shopping Ctr. v. Pagan*,
  712 S.W.2d 190 (Tex. App.—Houston [14th Dist.] 1986,
  writ ref'd n.r.e.)..................................................... 10, 11, 19, 21, 27

*Rogers v. Adler*,
  696 S.W.2d 674 (Tex. App.—Dallas 1985, writ ref'd n.r.e.)................. 16, 26

*Roylex, Inc. v. Langson Bros. Const. Co.*,
  585 S.W.2d 768 (Tex. Civ. App.—Houston [1st Dist.] 1979,
  writ ref'd n.r.e)....................................................................................31

*Seay v. Hall*,
  677 S.W.2d 19 (Tex. 1984) ...............................................................9-17, 20

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
  275 S.W.3d 444 (Tex. 2008) ....................................................................30

*Taylor v. First Community Credit Union*,
  316 S.W.3d 863 (Tex. App.—Houston [14th Dist.] 2010,
  no pet.) ............................................................... 10, 11, 19, 26

*Tri-State Building Specialties, Inc. v. NCI Building Systems, L.P.*,
  184 S.W.3d 242 (Tex. App.—Houston [1st Dist.] 2005, no pet.)...................9

*Tryco Enters., Inc. v. Robinson*,
  390 S.W.3d 497 (Tex. App.—Houston [1st Dist.] 2012)...................... 15, 29

*Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.*,
  127 S.W.3d 134 (Tex. App.—Houston [1st Dist.] 2003, no pet.)................32

*Wilburn v. State*,
     824 S.W.2d 755 (Tex. App.—Austin 1992, no writ) ....................... 10, 16, 23

*Williams v. Adams*,
     74 S.W.3d 437 (Tex. App.—Corpus Christi 2002, pet. denied) ........ 9, 10, 15

**Statutes**

Tex. Bus. Orgs. Code § 21.223 ................................................................29

Tex. Property Code § 91.006 ...................................................................18

Tex. Tax Code § 171.109 ........................................................... 10, 11, 19, 20, 26

Tex. Tax Code § 171.255 ........................................................................ passim

**Rules**

Tex. R. App. Pro. 38.1 ............................................................................9

## INDEX OF RECORD REFERENCES

CR                              Clerk's Record

RR                              Reporter's Record ([Vol.] RR [Page])

RR (Exhibits)                   Reporter's Record (5 RR [Pl/Def] [Exh. #])

App't.Br.                       Appellant's Brief

App'ee.Br.                      Appellee's Brief


Citations to documents included in the Appendix are noted by "Tab #."

**RESPONSE TO APPELLEE'S STATEMENT OF FACTS**

BPMT states that Francie Willis is "the owner and President of Urban Retreat." App'ee.Br. at 4; *see also* App'ee.Br. at 2 (same). As is discussed further below, BPMT returns throughout its brief to the theme that Ms. Willis is personally and individually responsible for Urban Retreat's obligations (e.g., for Urban Retreat's franchise taxes), perhaps on this assumption (unsupported in the record or the law) that she is its "owner."

However, BPMT does not and cannot offer any citation to the record for the assertion that Ms. Willis was the "owner" of Urban Retreat. Ms. Willis may have been a shareholder during at least some relevant times, but this is not apparent from the record for the simple reason that Ms. Willis's status as a shareholder was not an issue in this case.

BPMT sued Ms. Willis solely in her role as an officer. CR 99-100 (Tab 1). BPMT's motion for summary judgment (from which this appeal is taken) contained no evidence or argument suggesting that Ms. Willis was liable as a shareholder, and the statute BPMT relied on does not refer to shareholder liability. *See* CR 65-70 (Tab 2); Tex. Tax Code § 171.255 ("Liability of Director and Officers") (Tab 4). The stipulated facts on which the parties proceeded below do not contain any reference to whether or not Ms. Willis was an Urban Retreat shareholder. CR 367-68 (Tab 3). BPMT asserts this "fact" for the first time on

appeal, without any record references to support it. *See* Tex. R. App. Pro. 38.1(g).

Most important, since BPMT never asserted Ms. Willis's status as a shareholder in support of its motion for summary judgment, it cannot assert it as a basis to support the judgment now. *Fleming & Assoc., L.L.P. v. Barton*, 425 S.W.3d 560, 572 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) ("[S]ummary judgments must stand or fall on the grounds raised therein; we cannot consider grounds raised for the first time on appeal as a basis for affirming or reversing the trial court's judgment."); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (A "motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion."). Ms. Willis requests this Court to give no weight to BPMT's statements that Ms. Willis is Urban Retreat's "owner."

## ARGUMENT

I. **BPMT's reliance on *Taylor* and *Seay* to support its definition of "debt" is misplaced. (Response to Appellee's Brief, part I-A.)**

    A. **BPMT fails to address the fact that Section 171.255 is a penal statute that must be interpreted strictly against liability.**

As Ms. Willis argued in her initial brief, Section 171.255 is penal in nature and must be strictly construed *against* a finding of officer liability. App't.Br. at 21-22; *Tri-State Building Specialties, Inc. v. NCI Building Systems, L.P.*, 184 S.W.3d 242, 251 (Tex. App.—Houston [1st Dist.] 2005, no pet.); *Williams v.*

9

*Adams*, 74 S.W.3d 437, 440 (Tex. App.—Corpus Christi 2002, pet. denied); *Wilburn v. State*, 824 S.W.2d 755, 760 (Tex. App.—Austin 1992, no writ); *McKinney v. Anderson*, 734 S.W.2d 173, 174 (Tex. App.—Houston [1st Dist.] 1987, no writ); *Schwab v. Schlumberger Well Surveying Corp.*, 145 Tex. 379, 198 S.W.2d 79, 81 (1946) (construing 171.255's predecessor).

BPMT fails to show how its interpretation of Section 171.255 overcomes this requirement, or in fact to address this issue at all. Therefore, to the extent there is any doubt, Section 171.255 should be construed *against* a finding that Ms. Willis is personally liable for Urban Retreat's debt.

**B.     The *Taylor* court recognized that *but for* the passage of Section 171.109 (now repealed), it would have come out the other way**

BPMT suggests that the court in *Taylor v. First Community Credit Union*, 316 S.W.3d 863 (Tex. App.—Houston [14th Dist.] 2010, no pet.) relied on *Seay v. Hall*, 677 S.W.2d 19 (Tex. 1984) and the "ordinary" definition of "debt" BPMT urges in order to reach its decision. App'ee.Br. at 7 (*Taylor* "was based in part on prior definitions and standards set by the Texas Supreme Court"); App'ee.Br. at 19 (referring to the "reasoning and logic of *Taylor*").[1]   This is not accurate. The *Taylor* court noted expressly that—but for the legislature's passage of Section 171.109—it would have been bound by the holding in *River Oaks Shopping Ctr. v.*

---

[1] *But see* App'ee.Br. at 11 n.2, acknowledging that *Taylor* did not actually rely on *Seay.*

10

*Pagan*, 712 S.W.2d 190 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.), which supports Ms. Willis's position in this case. *Taylor*, 316 S.W.3d at 869. There is no discussion of the *Seay* opinion or of the "ordinary" meaning of the term debt; rather, the court refers to the definition in Section 171.109 as the "statutory definition." *Id.*

## C. Not only did *Seay* interpret an entirely different statute, but the legislature rejected and repealed *Seay's* interpretation of the word "debt"

BPMT puts a lot of emphasis on the interpretation of the word "debt" given by the Texas Supreme Court in *Seay v. Hall*. However, BPMT does not discuss either the reasoning of *Seay* or its reception by the legislature. Both are illuminating and demonstrate why *Seay's* definition of the word "debt" does not control here.

*Seay* involved a wrongful death action brought by the administrator of a decedent's estate. 677 S.W.2d at 20. There was uncertainty regarding whether the probate or district courts would have jurisdiction over the claim, so the administrator brought the wrongful death action in both the probate and district courts. *Id.* The defendants filed successful motions to dismiss in the probate court, arguing that the probate court lacked jurisdiction. *Id.* Therefore, the question presented in *Seay* was whether statutory probate courts have jurisdiction over wrongful death actions. *Id.*

11

The court examined the relevant Texas Probate Code sections then in effect at length. *Id.* at 20-21. The Probate Code provided that probate courts had the power to hear "all matters incident to an estate." *Id.* The Code defined matters "incident to an estate" as including "all claims by or against an estate." *Id.* at 21. Finally, the Code provided that "claims" "include liabilities of a decedent which survive…and **debts** due such estates." *Id.* (emphasis added). The court noted that the "pivotal issue" was whether "the statutory terms 'appertaining to estates and incident to an estate,' 'all matters relating to the settlement … of estates,' and 'claims'" were broad enough to confer dominant jurisdiction over wrongful death claims in probate courts. *Id.* (alteration in original).

The court then gave careful and detailed attention to the legislative history of the Probate Code sections at issue. *Id.* at 21-25. The court concluded that if "there is any legislative intent to be gleaned from the 1979 proceedings as to what appertains to an estate, it would seemingly be that the legislature did not intend to expand probate court jurisdiction to matters other than those in which the controlling issue was the settlement, partition, or distribution of an estate." *Id.* at 22. In light of its interpretation of the legislative history, the court construed the phrase "debts due [to the] estates" narrowly, thus restricting the probate court's jurisdiction to matters where the controlling issue was the settlement, partition, or distribution of an estate. *Id.* at 23.

With this background in mind, the court addressed whether a wrongful death claim should be considered a "debt due [to an] estate." Because such a claim would be unrelated to settlement, partition, or distribution of an estate, the court was reluctant to vest primary jurisdiction over such a claim in the probate court. Therefore, the court focused on the fact that a wrongful death claim is typically unliquidated and would not fall within the traditionally understood concept of a "debt due [to an] estate," reaching the result that it believed the legislature intended of vesting jurisdiction over such claims in the district courts. *Id.* at 23-25.

The year after *Seay* was decided, the Texas Legislature responded by passing legislation to overrule it. *Palmer v. Coble Wall Trust Co., Inc.*, 851 S.W.2d 178, 181 (Tex. 1992) ("We agree with the [assessment of the First Court of Appeals] that 'it is readily apparent that the purpose of [House Bill 479] was to overrule *Seay v. Hall.*'"), *citing Pearson v. K-Mart*, 755 S.W.2d 217, 219 (Tex. App.—Houston [1st Dist] 1988, no writ). Specifically, the legislature made the amendment for the purpose of clarifying that the a personal representative bringing a claim on behalf of estate could elect probate court for "any cause of action, liquidated or unliquidated, contract or tort." *Pearson*, 755 S.W.2d at 220.

In other words, *Seay* interpreted the word "debt" to exclude unliquidated claims (the interpretation BPMT relies on), and the Legislature's immediate response was to pass a law overruling that interpretation. *Seay* therefore hardly

13

presents a compelling case that "debt" must be construed to exclude unliquidated amounts.

**D.** ***Levy v. Hunt*, *Cain v. State*, and *Ballard v. Quinn* likewise do not support BPMT's argument regarding the meaning of "debt" in this case**

*Levy v. Hunt*, 14-00-00549-CV, 2001 WL 306149 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (not designated for publication), on which BPMT also relies, is another Probate Code case and, in a footnote, simply adopts *Seay's* definition of the word "debt." 2001 WL 306149 at *3 n.4 (Tab 5). It does not add anything that would support BPMT's argument here.

*Cain v. State*, 882 S.W.2d 515 (Tex. App.—Austin 1994, no writ), which BPMT also cites, is distinguishable in that it does not address a pre-existing contractual obligation like the one at issue here. *See* App'ee.Br. at 15. Instead, *Cain* addressed liability for administrative penalties assessed against a corporation for failure to plug abandoned oil wells. 882 S.W. 2d at 516.

As discussed in Ms. Willis's principal brief at 36, in a similar case the Austin Court of Appeals expressly distinguished cases like *Cain* from cases (such as this one) "arising from a post-forfeiture breach of an existing agreement." *Jonnet v. State*, 877 S.W.2d 520, 523 (Tex. App.—Austin 1994, writ denied). The court noted that "unlike situations in which the execution of a written instrument or a specific transaction creates an obligation or duty to pay for a later breach of the

14

agreement," in administrative penalty cases such as *Jonnet* or *Cain*, "the obligation to pay the statutory penalty *only arises* if and when a penalty is actually assessed." *Id.* at 523-24 (emphasis in original). *See also Williams v. Adams*, 74 S.W.3d 437, 443 (Tex. App.—Corpus Christi 2002, pet. denied) (distinguishing *Cain* and *Jonnet* on this basis); *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 518 (Tex. App.—Houston [1st Dist.] 2012) (Keyes, J., concurring) (cases like *Cain* are those in which "a penalty or judgment is incurred by a corporation after forfeiture of its corporate charter as a result of *the wrongful acts of the corporation's officers* or directors before or after forfeiture.") (emphasis added).

BPMT also relies on *Ballard v. Quinn*, 14-97-01057-CV, 1998 WL 787558 (Tex. App.—Houston [14th Dist.] Sep. 10, 1998, no pet.) (not designated for publication) to reinforce its proffered interpretation of the meaning of "debt" within Section 171.255. App'ee.Br. at 14. However, *Ballard v. Quinn* strongly supports Ms. Willis's case, as discussed in her principal brief. App't.Br. at 37-38. The *Ballard* court accepted *Seay's* definition of debt, but nonetheless refused to impose individual liability on the defendant officer, holding:

> Strict construction of [Section 171.255] prohibits the imposition of liability in the present case where all of the operative facts occurred nearly two years before the corporate charter was forfeited and related back to the termite inspection agreement. "The mere fact that the amount of money owed … as damages was unspecified at the time of the forfeiture does not establish that the debt was created or incurred after forfeiture."

15

1998 WL 787558 at *2 (Tab 6), *quoting Rogers v. Adler*, 696 S.W.2d 674, 677 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

Even if the Legislature had not overruled *Seay*, there is no reason why courts might not properly construe the word "debt" differently in different legal contexts. *See Wilburn v. State*, 824 S.W.2d 755, 759-60 (Tex. App.—Austin 1992, no writ) (discussing narrow and broad constructions of the word "debt" in a variety of Texas cases). The *Wilburn* court noted the rule of strict construction—which BPMT does not address and which did not apply in *Seay*—and concluded that "statutes making directors and officers liable for corporate debts must be strictly construed and cannot be extended beyond the clear meaning of their language." 824 S.W.2d at 760. For this reason, to the extent that there is doubt whether the definition of "debt" used by the *Seay* court should control here, the doubt should be resolved against a finding that Ms. Willis is personally liable for Urban Retreat's debt. App't.Br. at 21-22.

> **E.  BPMT's argument that the debt was unliquidated because of the lease's mitigation clause demonstrates one of the significant negative consequences of a ruling in BPMT's favor.**

BPMT has argued throughout this case that its duty to mitigate under the lease demonstrates that Urban Retreat's debt was unliquidated and therefore should fall within Section 171.255(a). CR 70 (BPMT's motion for summary judgment on Ms. Willis's liability) (Tab 2) (due to the mitigation clause, "the debt cannot be

16

calculated until the earlier of the leased premises being re-leased and the expiration of the lease term…. Despite efforts to re-lease, the Landlord was not able to re-lease the premises before the expiration of the lease term, and so it was not until the lease term expired that the debt could be calculated."); CR 99 (Second Amended Petition) (Tab 1) ("The debt owed to the Landlord under the Lease is calculated with the formula provided in Section 18.5 of the Lease, as follows: all rent and other charges required to be paid under the Lease through the end of the lease term *reduced* by sums received by the Plaintiff through the re-letting of the space during the lease term") (emphasis in original).

BPMT continues that theme in its brief before this Court. App'ee.Br. at 5 ("The tenant was liable for the *rent and other charges* required to be paid under the Lease … *reduced* by sums received through the re-letting of the space.") (emphasis in original); 13 (arguing that the amount due under the Lease was not ascertainable at the time of execution in part because the calculation included triple-net rent "and required the application of offsets (which were unknown at the time of the lease execution).").

By BPMT's reasoning, every time a corporate tenant goes out of business, stops paying its franchise taxes, and abandons its lease—an unfortunately common occurrence—its officers and directors will be personally liable for the balance the corporation owes on the lease, no matter how much and regardless of fault. This is

17

because (a) BPMT takes the position that all corporate officers are personally and individually responsible for ensuring their employer's franchise taxes are paid (*see, e.g.*, App'ee.Br. at 22, discussed below) and (b) as a matter of law, all leases must allow mitigation of damages through re-letting of the space. Tex. Property Code § 91.006 (providing that a "landlord has a duty to mitigate damages if a tenant abandons the leased premises in violation of the lease" and rendering void any contract term purporting to waive that right); *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997) (in a case pre-dating Tex. Property Code § 91.006, recognizing that in the absence of an agreement to the contrary, commercial landlords have "a duty to make reasonable efforts to mitigate damages when the tenant breaches the lease and abandons the property").

In other words, if the duty to mitigate renders the amount owed on the lease unknowable at the time the lease is signed, and if the fact that the amount owed is unknowable means that Section 171.255 is triggered once the corporation goes out of business and defaults on its franchise taxes, then corporate officers are taking on a staggering personal liability every time their employer signs a lease. No public purpose could be served by this result. Even though the jury in this case was not persuaded by this theory, and even if BPMT chooses to abandon it at oral argument, it is not clear why this result would not follow logically if this Court accepts BPMT's position regarding the meaning of "debt" in Section 171.255.

18

## II. BPMT does not show any reason why this Court should ignore the repeal of Section 171.109. (Response to Appellee's Brief, part I-B.)

BPMT argues that despite the Legislature's repeal of Section 171.109 (containing the definition of "debt" upon which BPMT relies), Section 171.255 was unaffected by the repeal. App'ee.Br. at 16. In other words, BPMT is urging this Court to accept that the Legislature intended the *passage* of Section 171.109 to modify officer and director liability, App'ee.Br. at 14,[2] but did not intend the *repeal* of Section 171.109 to have any effect on that modified liability, App'ee.Br. at 16.

BPMT's argument directly contradicts the law governing the effect of repealed statutes, as detailed by Ms. Willis in her principal brief. App't.Br. at 27-29. Moreover, BPMT does not offer any authority (or logic) to support its argument. BPMT argues that because the bill repealing Section 171.109 "restricted the method for an entity to arrive at its taxable margin … it was no longer necessary to have Section 171.109." App'ee.Br. at 16. To the contrary, if the Legislature intended Section 171.109 to continue enlarging the personal liability of corporate officers under Section 171.255, Section 171.109 would certainly still be necessary. Instead, however, the Legislature repealed it, and according to the law

---

[2] The Fourteenth Court agreed that the passage of Section 171.109 materially changed the effect of Section 171.255. *Taylor*, 316 S.W.3d at 869 (holding that because the passage of Section 171.109 constituted "an intervening and material change in the statutory law," the court was not required to follow the precedent set in *River Oaks Shopping Center v. Pagan*, 712 S.W.2d 190 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).).

governing savings of repealed statutes, Section 171.109 does not apply to this case. App't.Br. at 27-29.

## III. BPMT does not provide any persuasive reason why this Court should apply a definition of "debt" that has twice been rejected by the Texas Legislature. (Response to Appellee's Brief, part I-C.)

BPMT argues that even though the Texas Legislature has repealed Section 171.109 (and, although BPMT does not mention it, has also repealed the holding of *Seay* construing the term "debt"), this Court should apply the Section 171.109 definition anyway. App'ee.Br. at 16-17. BPMT's reasoning is not persuasive, as discussed below.

### A. BPMT's argument that all contracts payable after forfeiture of a corporate charter are subject to Section 171.255 is contradicted by decades of Texas case law.

BPMT argues that because Section 171.255 refers to debts that are "created" **or** "incurred," in order to give meaning to both words this Court must construe "incurred" to mean when the "triggering event in the future occurs" that requires the amount to be actually paid. App'ee.Br. at 18. Apparently, BPMT means by this that if a corporation enters into a contract when it is in good standing, but some or all of the contractual payments come due after the corporation forfeits its charter, the corporation's officers and directors should be individually liable for those later amounts.

This argument far overreaches BPMT's primary argument, which is limited

20

to sums that cannot be ascertained at the time a contract is entered. App'ee.Br. at 7 (The "debt in this case … was created or incurred at the time of the breach … because the amount of the debt could not be calculated at the time the lease was executed.").

More important, the courts of this State (including this Court) have repeatedly and emphatically rejected this argument. *Beesley v. Hydrocarbon Separation, Inc.*, 358 S.W.3d 415, 423 (Tex. App.—Dallas 2012, no pet.) ("We conclude that HSI's debt to Beesley was created or incurred in 1992 when the Employment Contract was signed, not in 1996 after forfeiture of HSI's charter."); *Serna v. State*, 877 S.W.2d 516, 519 (Tex. App.—Austin 1994, writ denied) ("Under Texas case law, contractual obligations entered into *before* the forfeiture of corporate privileges do not impose liability on the officers or directors for payments that are due *after* forfeiture.") (emphasis in original); *McKinney v. Anderson*, 734 S.W.2d 173, 174 (Tex. App.—Houston [1st Dist.] 1987, no writ) ("Under Section 171.255, individual liability is imposed only for debts contracted *after* the forfeiture of the right to do business, and has no application to obligations arising or renewed prior thereto.") (emphasis in original); *River Oaks Shopping Center v. Pagan*, 712 S.W.2d 190, 192 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (The "obligation to pay rent was created or incurred at the time the lease agreement was executed," not in the future when the periodic payments were

21

due.); *Curry Auto Leasing, Inc. v. Byrd*, 683 S.W.2d 109, 112 (Tex. App.—Dallas 1984, no writ) ("When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions relate back to and are authorized at the time of execution of the contract."); *Ballard v. Quinn*, 14-97-01057-CV, 1998 WL 787558 at *2 (Tex. App.—Houston [14th Dist.], Sept. 10, 1998, no pet.) (not designated for publication) (Tab 6) ("Individual liability is imposed only for debts contracted *after* the forfeiture of the right to do business, and has no application to obligations arising or renewed prior thereto.").

**B. It is possible to give meaning to both "create" and "incur" without mandating liability in this case.**

Contrary to BPMT's argument, it is possible to give different meanings to the words "create" and "incur" as used in the statute without violating the precedent set above or the policies embodied in Section 171.255, *and* without concluding that Ms. Willis must be liable in this case. *See* App'ee.Br. at 17-18. For example, imagine that a corporation in good standing enters into a contract with a bank to open a line of credit, and borrows some money on the line without drawing it down completely. Later, the corporation forfeits its charter, but after forfeiture an officer borrows additional money on the line of credit. The bank would have a strong argument that even though the corporation executed the contract enabling the line of credit *before* forfeiture, the debt incurred by drawing

22

down the line of credit *after* forfeiture triggered application of Section 171.255.

This result would additionally be consistent with the cases holding that the officer must engage in some culpable act (here, voluntarily borrowing new money even after the corporation lost the right to do business) in order to trigger personal liability. *PACCAR Fin. Corp. v. Potter*, 239 S.W.3d 879, 883 (Tex. App.—Dallas 2007, no pet.) ("The language of the statute is concerned with the creation or incursion of debts by the corporation after the franchise report is delinquent. … It is the act of creating or incurring a debt when the franchise report is delinquent that triggers personal liability…. These directors and officers have abused the corporate privilege by continuing to create and incur debts after the franchise tax is delinquent … and are, therefore, 'culpable.'"); *Wilburn v. State*, 824 S.W.2d 755, 761 (Tex. App.—Austin 1992, no writ) (Section 171.255 "was meant to prevent wrongful acts of culpable officers of a corporation" and creates personal liability in corporate officers for debts "knowingly and consensually created or incurred after forfeiture of corporate privileges and before revival of the right to do business."); *see also Schwab v. Schlumberger Well Surveying Corp.*, 148 Tex. 379, 198 S.W.2d 79, 81 (1946) (predecessor to 171.255 "was meant to prevent wrongful acts of culpable officers of a corporation, and was for the protection of the public and particularly those dealing with the corporation"); *Davis v. State*, 846 S.W.2d 564, 570 (Tex. App.—Austin 1993, no writ.) (Section 171.255 "is meant to prevent

23

wrongful acts of culpable officers of a corporation").

Similarly, this result would be consistent with subsection (c) of Section 171.255, which provides a safe harbor for directors and officers who object to the creation of the debt or who reasonably are not aware of it. Tex. Tax Code § 171.255(c). As discussed in Ms. Willis's principal brief, this safe harbor only makes sense if Section 171.255(a) contemplates a voluntary corporate act taken *after* forfeiture of the right to do business, because there is no reason to expect or require a corporate officer to object to ordinary business transactions made when a corporation is in good standing. App't.Br. at 32-34.

It is important to note in this case that once the lease was signed (which happened years before Urban Retreat forfeited its corporate charter, CR 367-68), there was nothing that Ms. Willis could have done to avoid Urban Retreat's liability on the lease. In other words, once Urban Retreat was no longer authorized to do business, there was no act or omission by Ms. Willis that created or worsened the corporation's liability on the lease. In fact, Urban Retreat attempted to reduce the harm by selling its assets, vacating the premises, and subletting to another corporation. CR 367 (Tab 3). However, when the sublessee vacated the premises, BPMT was unable to re-let it, leaving Urban Retreat liable on the remainder of the lease. *See* CR 70 (Tab 2) ("Despite efforts to re-lease, the Landlord was not able to re-lease the premises before the expiration of the lease term."); 3 RR 190:6-

24

191:1 (BPMT representative's testimony regarding efforts to re-lease).

Therefore, this case is *not* a case involving a culpable act after the forfeiture of the corporate charter. Relatedly, there was *no* opportunity for Ms. Willis to seek the safe harbor of Section 171.255(c), because all of the voluntary acts which created liability in this case (*i.e.*, signing the lease) took place while Urban Retreat was still in good standing. The fact that Ms. Willis was not able to protect herself from liability under BPMT's theory, despite the Legislature's intent to allow innocent officers to protect themselves, demonstrates why Section 171.255 should not apply in this case.

IV. **Contrary to BPMT's argument, the Tax Code does not create individual liability in corporate officers for their employers' franchise taxes. (Response to Appellee's Brief, part I-D.)**

A. **BPMT adds nothing new to its assertion regarding pre-existing contractual obligations; the case law still holds that officers are only liable for debts contracted *after* forfeiture.**

In Section D of its brief, BPMT reiterates its argument that contractual payments owed after forfeiture of a corporation's charter trigger Section 171.255. App'ee.Br. at 19-20. As discussed herein and in Ms. Willis's principal brief, Texas courts have rejected that argument, even when the amount due could not be calculated at the time the contract was signed. *Serna v. State*, 877 S.W.2d 516, 519 (Tex. App.—Austin 1994, writ denied) ("Even when the exact amount of future debt is unknown at the time the parties enter into the contract, Texas case law

25

holds that the entire debt was created at the time the contract was signed."); *Rogers v. Adler*, 696 S.W.2d 674, 677 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) ("The mere fact that the amount of money owed to Rogers as damages was unspecified at the time of the forfeiture does not establish that the debt was created or incurred after forfeiture."); *Curry Auto Leasing, Inc. v. Byrd*, 683 S.W.2d 109, 111-12 (Tex. App.—Dallas 1984, no writ) (Even though amounts due "were all ascertained, paid, or charged…after Physicians Accounting Services' corporate privileges had been forfeited," original contract was signed before forfeiture and therefore officers were not individually liable); *Ballard v. Quinn*, 14-97-01057-CV, 1998 WL 787558 at *2 (Tex. App.—Houston [14[th] Dist.], Sept. 10, 1998, no pet.) (not designated for publication) (quoting *Rogers v. Adler*, 696 S.W.2d at 677).

BPMT's assertion that "the reasoning and logic of *Taylor* is a better fit to the facts of this case" is puzzling. App'ee.Br. at 19. As discussed above, the result in *Taylor* was based exclusively on the enactment of Section 171.109 (now repealed). BPMT does not explain what "reasoning and logic" from *Taylor* would apply here.

In addition, Ms. Willis disagrees with BPMT's assertion that "the amount of liability was fully calculable at the inception of the lease" in *Curry Auto Leasing*. App'ee.Br. at 20. In that case, the vehicle lease at issue specified that upon termination of the lease, the cars would be sold and the profit or loss attributed to each would be applied to any remaining balance due on the lease. 683 S.W.2d at

26

110-11. The court expressly found that the offsets and penalties that were calculated as part of the corporation's ultimate debt "were all ascertained, paid, or charged after … Physicians Accounting Services' corporate privileges had been forfeited." *Id.* at 111.

BPMT makes the same argument with respect to *River Oaks Shopping Center v. Pagan*, 712 S.W.2d 190 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). However, the facts as discussed by the Court of Appeals do not reveal whether the amount was known or not at the time of contracting. Rather, the Court of Appeals did not appear to consider that fact significant in its determination, since it concluded that Section 171.255 only imposes liability for debts *contracted* after forfeiture of the right to do business. *Id.* at 192.

To the extent that BPMT is arguing that the mere fortuity of the calculation of triple-net rent should control liability under Section 171.255 (and abandoning its earlier argument regarding mitigation of damages), there is no sound basis in law, logic, or policy for that distinction, as set forth in Ms. Willis's principal brief. App't.Br. at 40-41.

**B. BPMT cannot rely—implicitly or otherwise—on an alter ego theory of liability against Ms. Willis because BPMT did not plead such a theory nor did it offer it in support of its motion for summary judgment.**

At pages 22-24 of its brief, BPMT makes an extraordinary argument in which it conflates Ms. Willis with Urban Retreat. For example, BPMT states that

Ms. Willis "chose to evade paying her taxes" and therefore should not be protected by the corporate shield. App'ee.Br. at 22; *see also* App'ee.Br. at 24 (Ms. Willis is not "innocent" because she "failed to pay her taxes, and she walked [sic] this lease."); 4 (Ms. Willis "allowed the corporate charter to be forfeited").

It is hard to make sense of this argument except as a belated and unsupported effort to pierce the corporate veil and hold Ms. Willis to be the alter ego of Urban Retreat. This conclusion is supported by BPMT's statement at page 22 that "[o]fficers and directors of companies enjoy great protections of the corporate shield in Texas: provided that they follow the rules, keep their affairs separate, and pay their taxes." This statement is not followed by any citation to the record or to the law.

Indeed, such citations would not be possible. With respect to the record, BPMT has never pleaded that Urban Retreat and Willis failed to keep their affairs separate, that they were alter egos or that the corporate veil should be pierced, or even that Willis was a shareholder of Urban Retreat; nor did BPMT make such an argument in support of its motion for summary judgment. *See* CR 65-70 (BPMT's motion for summary judgment) (Tab 2); CR 99-100 (BPMT's Second Amended Petition) (Tab 1) (pleading only that Ms. Willis is vicariously liable as an officer due to the application of Section 171.255). On this basis alone, this Court should reject BPMT's late-asserted theory of alter ego liability. *McConnell v. Southside*

*Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (A "motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion."). In addition, it is not clear what "rules" BPMT is alleging Ms. Willis failed to follow.

Moreover, BPMT's apparent statement regarding the basis of alter ego liability (officers must "follow the rules, keep their affairs separate, and pay their taxes") does not accurately reflect the state of the law in Texas. Rather, alter ego "applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. [Disregarding] the corporate structure involves two considerations: (1) the relationship between [the] two entities and (2) whether the entities' use of limited liability was illegitimate." *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd) (internal quotation marks omitted); *see also* Tex. Bus. Orgs. Code § 21.223 (in order to prove shareholder is corporation's alter ego, obligee must show that the shareholder caused the corporation to be "used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of" the shareholder).

Even BPMT acknowledges that in order to impose individual liability on an officer for a corporate obligation, there "must … be evidence of abuse, or …

injustice and inequity," such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." App'ee.Br. at 23, *quoting SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008). As stated above, BPMT did not plead any bases for alter ego liability in its petition, nor did its motion for summary judgment offer any evidence or argument in support of such liability.

Therefore, this Court should not give any weight to BPMT's repeated assertions that Ms. Willis failed to pay "her" taxes. Ms. Willis is at a loss to understand what basis there could be for BPMT to claim that Urban Retreat's franchise taxes were in fact Ms. Willis's taxes. If BPMT is arguing that officers must be personally responsible for ensuring their corporate employers' franchise taxes are paid, or face personal liability for their employers' debts under Section 171.255, BPMT is not only arguing for a result that it has cited absolutely no legal authority for, but which will also shock and alarm corporate officers throughout Texas, who face potentially astronomical personal liability for taxes and corporate debts over which they have no control.

While the Tax Code may have the goal of encouraging corporations to pay their franchise taxes, there is no justification in the law to further that asserted goal by imposing personal liability *for corporate franchise taxes* on corporate officers. Such a result would directly contravene the law of this state, which holds that

30

courts "will not disregard the corporate fiction and hold individual officers … liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Roylex, Inc. v. Langson Bros. Const. Co.*, 585 S.W.2d 768, 771 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e), *quoting Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 351 (1955).

**C. The rule that this Court applies in this case will be the rule that governs the liability of innocent corporate officers under Section 171.255.**

BPMT's attempts to throw mud on Ms. Willis, call her a tax evader, and conflate her with Urban Retreat do not and cannot have any effect on the analysis of this case because (among other things) there are no corresponding facts in the record. Rather, the facts in this case simply show that Ms. Willis was an officer of Urban Retreat and that BPMT did not plead or offer evidence to suggest that Ms. Willis was engaged in any wrongdoing.

Therefore, the rule that this Court applies in this case **will be the rule that applies to innocent corporate officers.** If this Court holds that Ms. Willis is liable for Urban Retreat's debt, other innocent corporate officers in analogous situations will be held to the same rule. For this additional reason, Ms. Willis urges the Court not to be influenced by BPMT's unsupported allegations that Ms.

31

Willis "owned" Urban Retreat, or that she evaded her taxes or otherwise committed wrongful acts.

**V.    Francie Willis cannot be vicariously liable for debt—including attorneys' fees—on which Urban Retreat is not liable. (Response to Appellee's Brief, part II.)**

As discussed herein, the basis for BPMT's theory of liability against Ms. Willis throughout the case has been vicarious liability pursuant to Section 171.255. CR 65-70; CR 99-100. "Vicarious liability is liability placed upon one party for the conduct of another, based solely upon the relationship between the two." *Vecellio Ins. Agency, Inc. v. Vanguard Underwriters Ins. Co.*, 127 S.W.3d 134, 138 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

Inherent in the notion of vicarious liability is that the active party (here, Urban Retreat) must *have* a liability before the passive party (here, Willis) can be vicariously liable for it. *See* Tex. Tax Code § 171.255(a) (providing for liability by officers for certain "debts *of the corporation*") (emphasis added).

Here, BPMT did not allege any independent basis for the award of fees against Ms. Willis. Rather, the sole basis on which she can be liable for attorneys' fees is via operation of Section 171.255, making her liable for *Urban Retreat's* attorneys' fees. Because Urban Retreat did not appeal the judgment, Urban Retreat cannot have incurred any conditional appellate fees for which Ms. Willis can be vicariously liable.

32

For the first time on appeal, BPMT argues that it could have asserted that Ms. Willis was personally liable, in the manner of a partner, on BPMT's lease. App'ee.Br. at 25. However, BPMT's motion for summary judgment merely asked the court to find that Ms. Willis was liable for the "debt arising from [Urban Retreat's] default" on the lease. Since BPMT's summary judgment argument was premised exclusively on a theory of vicarious liability for Urban Retreat's debt, rather than a finding that Ms. Willis was independently and individually liable on the lease itself, BPMT cannot now argue that Ms. Willis has independent liability to BPMT for a breach of contract claim. *Fleming & Assoc., L.L.P. v. Barton*, 425 S.W.3d 560, 572 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) ("[S]ummary judgments must stand or fall on the grounds raised therein; we cannot consider grounds raised for the first time on appeal as a basis for affirming or reversing the trial court's judgment."); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (A "motion for summary judgment must itself expressly present the grounds upon which it is made. A motion must stand or fall on the grounds expressly presented in the motion.").

Therefore, there was no independent basis on which the trial court could award fees against Ms. Willis, as opposed to holding her vicariously liable for fees owed by Urban Retreat. Since Urban Retreat did not appeal and cannot be held liable for conditional appellate fees, Ms. Willis likewise cannot be liable for

33

conditional appellate fees.  To the extent that the judgment of the court below held otherwise, it is incorrect.

## CONCLUSION AND PRAYER

The trial court incorrectly granted summary judgment in BPMT's favor and denied Ms. Willis's cross-motion.  Since Ms. Willis should not be personally liable on BPMT's claim as a matter of law, appellant asks this Court to reverse the trial court's judgment and render a judgment that BPMT take nothing against her. Should this Court decline to reverse the trial court's ruling on summary judgment, Ms. Willis asks this Court to vacate the portion of the judgment awarding BPMT $45,000 in conditional appellate fees.

Respectfully submitted,

AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING, P.C.

*/s/ Jane Langdell Robinson*
Jane Langdell Robinson
State Bar No. 24062970
Tiffany Joudi
State Bar No. 24065479
Reed N. Smith
State Bar No. 24067875
1221 McKinney Street
Houston, Texas 77010
Telephone:  (713) 655-1101
Telecopier:  (713) 655-0062

*Counsel for Appellant*

34

**CERTIFICATE OF SERVICE**

I hereby certify that on December 30, 2014, a true and correct copy of the above and foregoing document was served by electronic filing manager and/or by email in accordance with the Texas Rules of Appellate Procedure on the following counsel of record:

Jonathan D. Saikin
Tanya Garrison
Weycer, Kaplan, Pulaski & Zuber, P.C.
1400 Summit Tower
Eleven Greenway Plaza
Houston, TX 77046
Facsimile (713) 961.5341

*Counsel for Appellee, BPMT, LLC.*

*/s/ Jane Langdell Robinson*
Jane Langdell Robinson

# CERTIFICATE OF COMPLIANCE

I certify that this Appellee's Reply Brief complies with the typeface and word-count requirements set forth in the Texas Rules of Appellate Procedure. This Brief has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This Brief contains 6,745 words, as determined by the word count feature of Microsoft Word, excluding those portions exempted by TEX. R. APP. P. 9.4(i)(1).

*/s/ Jane Langdell Robinson*
Jane Langdell Robinson

No. 01-14-00537-CV
_____

IN THE FIRST COURT OF APPEALS
HOUSTON, TEXAS
_____

FRANCIE WILLIS,
Appellant,

v.

BPMT, LLC,
Appellee.
_____

INDEX TO APPENDIX
_____

**TAB**        **DESCRIPTION**

Tab 1        Plaintiff's Second Amended Petition (CR 97-101)

Tab 2        Plaintiff's Motion for Partial Summary Judgment on Liability of
             Defendant Francie Willis (CR 65-71)

Tab 3        Stipulated Facts (CR 367-68)

Tab 4        Texas Tax Code § 171.255

Tab 5        *Levy v. Hunt*, No. 14-00-00549-CV, 2001 WL 306149 (Tex. App.—
             Houston [14th Dist.] March 29, 2001, no pet.) (not designated for
             publication)

Tab 6        *Ballard v. Quinn*, No. 14-97-01057-CV, 1998 WL 787558 (Tex.
             App.—Houston [14th Dist.] Sep. 10, 1998, no pet.) (not designated for
             publication)

**TAB 1**

Filed 11 August 31 A11:33
Chris Daniel - District Clerk
Harris County
ED101J016475051
By: irma medina

CAUSE NO. 2010-49638

| | | |
|---|---|---|
| BPMT, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, TEXAS |
| URBAN RETREAT OF HOUSTON, INC., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | 164TH JUDICIAL DISTRICT |

## PLAINTIFF'S SECOND AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff BPMT, LLC, ("Landlord" or "Plaintiff"), and files this its First Amended Petition, complaining of and against Defendants URBAN RETREAT OF HOUSTON, INC. ("Urban Retreat"), FRANCIE WILLIS ("Willis"), and LANCE ROSMARIN ("Rosmarin") (Urban Retreat, Willis, and Rosmarin are collectively referred to as "Defendants"), and for its causes of action and claims for relief would respectfully show unto the Court the following:

### I. DISCOVERY

1. This case is being governed under a Level 2 discovery control plan under TEX. R. CIV. P. 190.3.

### II. PARTIES

2. Landlord is a Texas limited liability company doing business in the State of Texas.

3. Defendant URBAN RETREAT OF HOUSTON, INC. has appeared in this lawsuit.

4. Defendant FRANCIE WILLIS has appeared in this lawsuit.

5.    Defendant LANCE J. ROSMARIN is a Texas resident and may be served with process at 2329 San Felipe, Houston, Texas 77019, or wherever else he may be found in this State.

### III. JURISDICTION AND VENUE

6.    The Court has jurisdiction over Defendant because it is domiciled in the State of Texas. The Court has jurisdiction over the controversy because the damages sought are within its jurisdictional limits.

7.    Venue is proper in Harris County, Texas, because this is a dispute over a lease of real property located in Harris County, Texas. Subchapter B of the Venue provisions, entitled "Mandatory Venue" provides:

> Actions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, for recovery of damages to real property, or to quiet title to real property **shall be brought in the county in which all or a part of the property is located.**

TEX. CIV. PRAC & REM. CODE ANN. § 15.0115 (Vernon 2001) (emphasis added). In addition, all or a substantial part of the events or omissions giving rise to the claims made the basis of this lawsuit occurred in Harris County. TEX. CIV. PRAC. & REM. CODE ANN. § 15.002(a) (Vernon 2001).

### IV. FACTS

8.    On July 30, 2010, Urban Retreat, the original tenant under a certain commercial lease ("Lease") with Plaintiff, forfeited its corporate privileges with the State of Texas.

9.    In August 2010, an event of default occurred under the Lease with Plaintiff when Plaintiff failed to receive that month's rent and other charges due under the Lease. Plaintiff served the parties with notice of the default and provided them with an opportunity to cure the default. However, they failed to cure.

10. As a result of the default under the Lease, Plaintiff elected its right under the Lease to terminate all parties' right to possession of the leased premises, but Plaintiff did not terminate the Lease itself.

11. The debt owed to the Landlord under the Lease is calculated with the formula provided in Section 18.5 of the Lease, as follows: all rent and other charges required to be paid under the Lease through the end of the lease term *reduced* by sums received by the Plaintiff through the re-letting of the space during the lease term.

12. In August 2010, at the time of the default, and continuing through when Plaintiff filed suit in this case, Plaintiff was incapable of quantifying its losses and damages incurred due to the default per Section 18.5 of the Lease, because Plaintiff was unable to re-let the space, despite its reasonable efforts to do so. In addition, other charges due under the Lease for 2011, being the pro rata share of common area costs, insurance premiums, and taxes for the following lease year, were unknown at the time of the default and not known until 2011.

## V. BREACH OF CONTRACT

13. Landlord incorporates the factual statements in the preceding paragraphs. As a result of Urban Retreat's failure to timely cure the default under the Lease, Urban Retreat thereby breached the Lease.

14. Landlord has complied with all conditions precedent. Landlord has incurred actual damages as a result of Urban Retreat's default.

15. Urban Retreat has forfeited its corporate charter and privileges. Defendants Willis and Rosmarin were officers and/or director of Urban Retreat at the time it lost its charter. In accordance with Section 171.255 of the Texas Tax Code, Willis and Rosmarin are personally liable to the Landlord for the violations of the Lease.

16. As such, Plaintiff prays that all Defendants be held jointly and severally liable to Plaintiff for all rent and other sums due and owing under the Lease.

## VI. ATTORNEYS FEES

17. Landlord would further allege and show that by reason of the aforesaid breach on the part of the Defendants, it was necessary for Landlord to retain the services of the undersigned attorneys to prosecute this cause of action and claim for relief, and therefore, Landlord is entitled to recover its reasonable attorneys' fees, as provided in the Lease and under section 38.001(8) of the Texas Civil Practice and Remedies Code. Landlord has employed the law firm of Weycer, Kaplan, Pulaski & Zuber, P.C., and agreed to pay it a reasonable fee for such services, for which amount Plaintiff sues.

## VII. REQUESTED RELIEF

WHEREFORE, Plaintiff BPMT, LLC requests that, upon final hearing hereof, Plaintiff have and recover judgment of and against Defendants, jointly and severally, for the following:

a. Actual damages within this court's minimum jurisdictional limits;

b. Reasonable attorneys' fees;

c. Applicable pre-judgment interest;

d. Applicable post-judgment interest at the maximum legal rate for judgment prevailing in the State of Texas from the date Judgment is signed until paid;

e. Costs of Court; and

f. Such other and further relief, both general or special, at law or in equity, to which Plaintiff may show itself justly entitled.

100

Respectfully submitted,

WEYCER, KAPLAN, POLASKI & ZUBER, P.C.

BY:_____

JONATHAN D. SAIKIN
State Bar No. 24041847
1400 Summit Tower
Eleven Greenway Plaza
Houston, Texas 77046
Telephone Number: 713/961-9045
Facsimile Number: 713/961-5341

ATTORNEYS FOR PLAINTIFF
BPMT, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Second Amended Petition was served upon the parties listed below by facsimile and/or certified mail, return receipt requested, on this the ___ day of August 2011.

Amir H. Alavi
Tiffany Isaac
Ahman, Zavitsanos & Anaipakos, P.C.
1221 McKinney Street
Houston, Texas 77010
[Fax: (713) 655-0062]

JONATHAN D. SAIKIN

**TAB 2**

CAUSE NO. 2010-49638

| | | |
|---|---|---|
| BPMT, LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, TEXAS |
| URBAN RETREAT OF HOUSTON, INC., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | 164TH JUDICIAL DISTRICT |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY OF DEFENDANT FRANCIE WILLIS

Plaintiff BPMT, LLC ("Plaintiff" or "Landlord") files this motion for partial summary judgment seeking a judgment on liability of Defendant FRANCIE WILLIS ("Defendant" or "Willis"), and in support thereof would show the Court the following:

### I.    Summary of Argument

Willis is personally liable for the debt owed to Plaintiff because:

(1)    The default under the Lease did not occur until after Urban Retreat of Houston, Inc. ("Tenant") forfeited its corporate charter.

(2)    The debt arising from the default does *not* relate back to the time the Lease was executed because the debt arising from the default was not known until after the corporate charter was forfeited and the default occurred.

(3)    Because the debt arising from the default was not known until after forfeiture, the debt was not *created* until after forfeiture.

(4)    Because the debt was created after forfeiture, Willis is personally liable for the debt.

{BPM000\00001\0656378.DOC;1\JDS}

65

## II. Background Facts[1]

On July 30, 2010, Tenant forfeited its corporate privileges with the State of Texas.

In August 2010, after the forfeiture, the Tenant and Willis breached the lease agreement ("Lease") with Plaintiff by failing to pay that month's rent and other charges due under the Lease. *See* the Lease (and all amendments thereto) attached to Defendant's summary judgment motion. Plaintiff notified the Tenant and Willis of the default and provided the Tenant with an opportunity to cure the default. However, the Tenant failed to cure.

As a result of the default under the Lease, Plaintiff elected its right under the Lease to terminate the Tenant's right to possession of the leased premises, but Plaintiff did not terminate the Lease itself.

The debt owed by the Tenant to the Landlord under the Lease is calculated with the formula provided in Section 18.5 of the Lease, as follows: all *rent* and *other charges* required to be paid under the Lease through the end of the lease term *reduced* by sums received by the Plaintiff through the re-letting of the space during the lease term. *See* Lease at § 18.5 (emphasis added).

The *"other charges"* referenced in the formula above consist of the Tenant's pro rata share of common area costs, insurance premiums, and taxes for the subsequent lease year, which are calculated yearly and which were not known until 2011 after the default in August of 2010.

---

[1] Supported by Affidavit of Vahid Shariatzadeh, attached as Exhibit "A" to Plaintiff's Response to Motion for Summary Judgment filed on April 25, 2011.

### III.  Legal Authority and Arguments

*Texas Tax Code*

Texas Tax Code section 171.255 states:

(a)     If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each **debt** of the corporation that is **created** or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived.

(b)     The liability of a director or officer is in the same manner and to the same extent as if the director or officer were a partner and the corporation were a partnership.

Tex. Tax Code § 171.255(a) and (b) (emphasis added).

### MEANING OF "DEBT" IN TEXAS TAX CODE

A debt has been defined as any legally enforceable obligation measured in a <u>certain</u> amount which must be performed or paid within a reasonable period of time or on demand. *Taylor v. First Community Credit Union*, 316 S.W.3d 863, 867 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (relying on definition of debt in Chapter 171 of Texas Tax Code which has since been repealed) (emphasis added).

The Texas Supreme Court has relied on a similar definition of debt.  According to the Court, a debt is a <u>specified</u> sum of money owing to one person from another, including not only an obligation of a debtor to pay but the right of a creditor to receive and enforce payment." *Seay v. Hall*, 677 S.W.2d. 19, 23 (Tex. 1984) (citing to <u>Black's Law Dictionary</u> (5th ed. 1979)) (emphasis added).

### WHEN IS A DEBT CREATED

In July 2010, the Fourteenth Court of Appeals decided *Taylor v. First Community Credit Union*, and gave an opinion on the issue of when a debt is created for purposes of holding

corporate officer personally liable under Section 171.255 of Texas Tax Code.

In *Taylor*, the Claimant sued a company ("Company") for breach of contract, and because the default occurred after the Company forfeited its charter, the claimant also sued the corporate officer of the Company. *See Taylor*, 316 S.W.3d at 865. Prior to the forfeiture of the Company's charter, the Company entered into a certain dealer agreement (hereinafter referred to as the "Master Agreement") with the Claimant. *Id.* As part of the Master Agreement, the Claimant had the right to purchase retail installment contracts, which the Claimant did purchase from the Company. *Id.* The Claimant later learned that the Company breached its contractual obligations under the Master Agreement by failing to provide good title to the vehicles that the Claimant purchased. *Id.*

After the Company's default under the Master Agreement, and about two years after the Company forfeited its privileges, the Claimant filed suit against the company as well as the individual director for breach of the Master Agreement. *Id.* at 866. At trial, only the director answered and the court awarded the Claimant its damages against both the company as well as the individual director, jointly and severally. *Id.* The director appealed the trial court's decision. *Id.*

On appeal, the director asserted that the trial court erred by holding him personally liable under the Master Agreement because the Company's charter was in place at the time the Master Agreement was executed.[2] *Id.* On appeal, the parties agreed that the corporate privileges were forfeited as of September 7, 2004, such that the director would be personally liable for any debt of the corporation that was created or incurred after that date. *Id.* at 867. The court, relying on a

---

[2] This is the argument that Willis makes in the instant lawsuit.

statutory definition[3], noted that a "debt" is "any legally enforceable obligation measured in a certain amount of money which must be performed or paid within an ascertainable period of time or on demand." *Id.* The director stipulated that the Company breached the contract after the privileges were forfeited, but argued that any damages arising from the breach related back to when the Master Agreement was first executed. *Id.*

The Court of Appeals noted that the relation back doctrine relied on by the director failed to take into account the proper meaning of "debt." *Id.* at 869. At the time the Master Agreement was executed, no party had breached the Master Agreement and no specific amount of money was owed under the Master Agreement. *Id.* **The court held that a debt cannot relate back to a time before its amount was known**. *Id* at 869 (emphasis added). And so, the result the director was seeking would have directly conflicted with the meaning of "debt". *Id.* The Court of Appeals held that the relation back doctrine did not apply, and held that the debt was created after the forfeiture, making the director individually liable for the debt under the Texas Tax Code. *Id.*

### THE CASE BEFORE THIS COURT

Relying on the authority from *Taylor v. First Community Credit Union* that a debt cannot relate back to a time before its amount was known, in the instant case the debt arising from the default was not created until after the Tenant forfeited its corporate privileges for the following reasons:

(1)    The default did not occur until after the forfeiture.

(2)    The *other charges* due under the Lease were not known until the following year.

---

[3] The court could also have relied on the Texas Supreme Court's definition of debt in *Seay v. Hall. See Seay*, 677 S.W.2d. at 23

As stated above, the Lease provides that, in addition to base rent, the Tenant was also responsible for other charges, being the Tenant's pro rata share of the common area costs, insurance premiums, and taxes. *See* Articles 1, 4 and 6 of the Lease. All of these charges are calculated year by year, and so charges for 2011 were not known in 2010.

(3) Per Section 18.5, the Tenant is liable to the Landlord for all rent and other charges required to be paid under the Lease *diminished* by any sums received by the Landlord through the re-letting of the premises during the lease term. Under this formula, the debt cannot be calculated until the earlier of the leased premises being re-leased and the expiration of the lease term, because only at such earlier time does the Landlord know by what amount the rent and other charges should be diminished to calculate the debt arising from the default. Despite efforts to re-lease, the Landlord was not able to re-lease the premises before the expiration of the lease term, and so it was not until the lease term expired that the debt could be calculated.

Because the debt was not known until after the default, the debt was not created until after the default, and so Willis is personally liable to Plaintiff. *See Taylor*, 316 S.W.3d at 869.

## Prayer

WHEREFORE, Plaintiff requests the Court grant summary judgment on liability, and set trial on damages, and grant all other relief to which Plaintiff is justly entitled.

Respectfully submitted,

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By:_____
JONATHAN D. SAIKIN
State Bar No. 24041847
Eleven Greenway Plaza, Suite 1400
Houston, Texas 77046
Telephone Number: (713) 961-9045
Facsimile Number: (713) 961-5341

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion for Partial Summary Judgment was served upon the parties listed below by hand delivery, on this the 24ᵗʰ day of June 2011.

Amir H. Alavi
Tiffany Isaac
Ahman, Zavitsanos & Anaipakos, P.C.
1221 McKinney Street
Houston, Texas 77010
[Fax: (713) 655-0062]

_____
JONATHAN D. SAIKIN

**TAB 3**

CAUSE NO. 2010-49638

| | | |
|---|---|---|
| BPMT, LLC | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| URBAN RETREAT OF HOUSTON, | § | |
| INC. and FRANCIE WILLIS | § | |
| | § | |
| Defendants. | § | 164TH JUDICIAL DISTRICT |
| | § | |

## STIPULATED FACTS

- Defendant Francie Willis is a resident of Texas.
- Francie Willis was a corporate officer of Urban Retreat of Houston ("URH").
- Willis/Hite Enterprises, Inc. was incorporated in the state of Texas on March 13, 1989, a true and correct copy of the Articles of Incorporation is attached as Exhibit A.
- Willis/Hite Enterprises, Inc. filed its assumed name of records for Urban Retreat on June 07, 1989, a true and correct copy is attached as Exhibit B.
- Willis/Hite Enterprise amended its Articles of Incorporation to change its name to Urban Retreat of Houston, Inc., a true and correct copy of the Amendment to the Articles of Incorporation is attached as Exhibit C.
- URH entered into a Lease Agreement with BPMT, LLC ("BPMT") on May 23, 1995, a true and correct copy of which is attached as Exhibit D.
- URH entered into an Addendum to the Lease Agreement on December 1, 1997, a true and correct copy of which is attached as Exhibit E.
- URH executed a Renewal Agreement on April 18, 2001, a true and correct copy of which is attached as Exhibit F.
- URH executed a lease extension with BPMT on May 19, 2006 which extended the lease for five years, a true and correct copy of which is attached as Exhibit G.
- Francie Willis signed the agreements with BPMT as an officer of URH, specifically President.
- Francie Willis was not acting in her personal capacity at the time Urban Retreat signed any Agreement with BPMT.
- In March 2010 URH was sold to Urban Spas of Houston, Inc. ("Urban Spas").
- Urban Spas of Houston signed an Asset Purchase Agreement with URH, a true and correct copy of which is attached as Exhibit H.
- Urban Spas signed a Sublease Agreement with URH, a true and correct copy of which is attached as Exhibit I.
- BPMT received monthly lease payments from URH through March 2010.
- Beginning in April 2010 the monthly lease payments BPMT received were from Urban Spas.

367

- BPMT received a check from Urban Spas in April 2010 in the amount of $12,295.20 for the April payment due under the Lease Agreement.
- BPMT received a check from Urban Spas in May 2010 in the amount of $12,295.20 for the May payment due under the Lease Agreement, a true and correct copy of which is attached as Exhibit J.
- BPMT received a check from Urban Spas on June 01, 2010 in the amount of $12,295.20 for the June payment due under the Lease Agreement, a true and correct copy of which is attached as Exhibit K.
- BPMT received a check from Urban Spas on July 20, 2010 in the amount of $12,995.20 for the July payment due under the Lease Agreement, a true and correct copy of which is attached as Exhibit L.
- On July 30, 2010 pursuant to Section 171.309 of the Texas Tax Code, the Secretary of State forfeited URH's charter.
- At the time the lease and lease extensions were executed, Urban Retreat maintained its corporate privilege.
- All agreements between URH and BPMT were executed before URH's corporate charter was forfeited by the Secretary of State in July 30, 2010.
- Francie Willis never signed the lease or lease extensions with BPMT in her personal or individual capacity.
- In August 2010, BPMT failed to receive the proper lease payment under the Lease.
- The Lease Agreement ended on April 30, 2011.
- The total monthly rent for May 2010 to April 30, 2011 was $12,526.14.
- Total rent due from August 2010 to April 30, 2011 was $112,735.26.

Agreed to in form and substance:

WEYCER KAPLAN PULASKI & ZUBER, PC

By: /s/ Jonathan Saikin (by Permission)
Jonathan Saikin
State Bar No. 24041847
Eleven Greenway Plaza, Suite 1400
Houston, Texas 77046
Telephone: 713-961-9045
Telecopier: 713-961-5341

**ATTORNEYS FOR PLAINTIFF BPMT, LLC**


AHMAD, ZAVITSANOS, ANIAPAKOS,
ALAVI & MENSING

By: /s/ Tiffany Joudi
Amir H. Alavi
State Bar No. 00793239
Tiffany Joudi
State Bar No. 24065479
Reed Smith
State Bar No. 24067875
1221 McKinney Street
Houston, Texas 77010
Telephone:(713) 655-1101
Telecopier:(713) 655-0062

**ATTORNEYS FOR DEFENDANTS
URBAN RETREAT OF HOUSTON, INC.
AND FRANCIE WILLIS**


4840-4978-6897, v. 2



**TAB 4**

Vernon's Texas Statutes and Codes Annotated
Tax Code (Refs & Annos)
Title 2. State Taxation (Refs & Annos)
Subtitle F. Franchise Tax (Refs & Annos)
Chapter 171. Franchise Tax (Refs & Annos)
Subchapter F. Forfeiture of Corporate and Business Privileges (Refs & Annos)

V.T.C.A., Tax Code § 171.255

§ 171.255. Liability of Director and Officers

Currentness

(a) If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived. The liability includes liability for any tax or penalty imposed by this chapter on the corporation that becomes due and payable after the date of the forfeiture.

(b) The liability of a director or officer is in the same manner and to the same extent as if the director or officer were a partner and the corporation were a partnership.

(c) A director or officer is not liable for a debt of the corporation if the director or officer shows that the debt was created or incurred:

(1) over the director's objection; or

(2) without the director's knowledge and that the exercise of reasonable diligence to become acquainted with the affairs of the corporation would not have revealed the intention to create the debt.

(d) If a corporation's charter or certificate of authority and its corporate privileges are forfeited and revived under this chapter, the liability under this section of a director or officer of the corporation is not affected by the revival of the charter or certificate and the corporate privileges.

**Credits**

Acts 1981, 67th Leg., p. 1704, ch. 389, § 1, eff. Jan. 1, 1982.

Notes of Decisions (86)

V. T. C. A., Tax Code § 171.255, TX TAX § 171.255
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document

© 2014 Thomson Reuters. No claim to original U.S. Government Works.



**TAB 5**

**2001 WL 306149**
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL VALUE
BUT MAY BE CITED WITH THE NOTATION "(not
designated for publication)."

Court of Appeals of Texas, Houston (14th Dist.).

Raquel A. LEVY, Individually and as Independent
Executrix of the Estate of Jaime Levy, Deceased,
Appellant,
v.
Donald Wayne HUNT, David Hilditch, Hilditch
Financial Services, Chubb Life Insurance
Company of America and Its Successor in Interest
Jefferson Pilot Financial Insurance Company,
Appellees.

No. 14-00-00549-CV. | March 29, 2001.

On Appeal from the Probate Court Number Four, Harris
County, Texas, Trial Court Cause No. 299684-401.

Panel consists of YATES, FOWLER, and FROST, JJ.

## OPINION

FROST.

*1 Appellant, Raquel A. Levy, individually and as
independent executrix of her late husband's estate,
appeals from the trial court's take-nothing judgment in
favor of appellees, Chubb Life Insurance Company of
America, its successor in interest, Jefferson Pilot
Financial Insurance Company, and its agents, David
Hilditch and Donald Wayne Hunt, d/b/a Hilditch
Financial Services. We affirm.

## I. BACKGROUND

In July 1996, Raquel Levy, then age 71, and her late
husband, Dr. Jaime Levy, then age 72, sought to purchase
a "second-to-die" life insurance policy. This type of
policy is generally used as an estate planning tool where
the joint insureds are husband and wife who have a large
taxable estate and need additional funds to pay estate
taxes at the time of the death of the surviving spouse.
Mrs. Levy contacted Donald Hunt of Hilditch Financial
Services, her long time insurance agent, and asked him to
come to her home to discuss a "second-to-die" policy.
Several days later, Mr. Hunt went to the Levys' home,
bringing with him a brochure describing the
"second-to-die" policy, along with an application and
other documents.

After discussing the provisions of the policy, the Levys
completed an application to purchase a "second-to-die"
policy from Chubb. In this application, the Levys listed
themselves as the only beneficiaries. Mr. Hunt then
forwarded the application to Chubb for underwriting and
approval. Chubb refused to issue the policy under the
application, as submitted. On August 19, 1996, Mr. Hunt
informed the Levys, upon information from Chubb, that
(1) the beneficiary designation had to be changed, and an
amendment to the application signed, before the policy
would become effective; and (2) an incorrect spelling of
Mrs. Levy's first name had to be corrected. At that time,
Mrs. Levy instructed Mr. Hunt that the Levys' adult
daughter, Rebecca Klavan, should be the primary
beneficiary on the insurance policy. That same day, Mr.
Hunt sent Chubb a fax communication correcting the
mispelled name and designating Mrs. Klavan as the
beneficiary.

The amendment form is in two parts, a top copy, and a
bottom (yellow) copy, attached at the top with a gum
adhesive. The form was designed so that the original
amendment to the policy application could be separated
from the yellow copy for signing by the insureds. The
yellow copy is then bound, along with the policy and
related forms, into a booklet. In order to make the
necessary changes to the application, Mr. Hunt took the
policy, bound with the yellow copy of the application
amendment, and the original amendment to the
application, to the Levys' home on September 4, 1996.
After Mr. Hunt explained the insurance policy and
amendment form to her, Mrs. Levy signed the original
amendment to the application,[1] which named the Levys'
daughter as beneficiary. Mrs. Levy signed the document
in Mr. Hunt's presence. Mr. Hunt then told Mrs. Levy that
he needed Dr. Levy to sign the amendment to the
application. Mrs. Levy took the amendment application
form into another room and returned, ostensibly with Dr.
Levy's signature on it, and presented the forms to Mr.
Hunt. The Levys paid the initial insurance premium that
day, and Chubb delivered the "second-to-die" policy to
the Levys.[2] Evidence adduced at trial indicates that Mrs.
Levy's signature on the amendment application was

authentic but that Dr. Levy's signature was not.

1. The yellow copy was not signed because, appellees assert, this copy was to be retained by the Levys for their own files and was not to be sent back to Chubb.

2. Mrs. Levy paid the premium by endorsing over to Chubb a check payable to the Levys for $33,433.77.

**\*2** Dr. Levy died in July 1998. After his death, Mrs. Levy claimed that Chubb owed her $1,000,000 in death benefits because she was the last surviving beneficiary in the policy. Chubb refused to pay the benefits to her on the grounds that the benefits were payable only to the Levys' daughter, Rebecca Klaven, and only after the deaths of both Dr. and Mrs. Levy as the insured parties in the "second-to-die" policy.

Mrs. Levy filed suit in Harris County Probate Court Number Four, alleging that Chubb breached the insurance contract and that Chubb and Hilditch Financial committed negligence and violations of the Texas Deceptive Trade Practices Consumer Protection Act ("DTPA") and the Texas Insurance Code. In addition to seeking recovery of the $1,000,000 in death benefits, the petition requested damages for the cost to hire estate planning experts to remedy the negative tax consequences of the policy on the Levys' estates.

The case proceeded to trial before a jury. The jury found in favor of the defendants on all theories. The probate court entered a take-nothing judgment in favor of the defendants.

## II. ISSUES PRESENTED FOR REVIEW
In her first point of error, Mrs. Levy asks that we determine whether the probate court lacked subject matter jurisdiction of this case, as urged by appellee Hunt during trial. Although Mrs. Levy, Mr. Hunt, and Chubb now agree that the probate court had jurisdiction of this case, Mrs. Levy urges us to rule on this issue to preclude it from being raised in a future appeal. In her second point of error, Mrs. Levy asserts that (1) if the policy is ambiguous, the trial court should have submitted the question of the intended beneficiary to the jury; and alternatively, that (2) if the policy is unambiguous, the trial court should have awarded the death benefits to Mrs. Levy as the only surviving beneficiary named in the policy. In addition, Mrs. Levy asserts that because the policy has been "in force" for a period of two years,

Chubb cannot contest the policy based on the policy's mandatory incontestability provision.

## III. SUBJECT MATTER JURISDICTION IN THE PROBATE COURT
Chubb argues that whether the probate court has subject matter jurisdiction of this cause is not an issue preserved for appellate review because, although Hunt filed a motion to dismiss for lack of subject matter jurisdiction with the probate court, the court never ruled on the motion, and Mrs. Levy never objected to the court's failure to rule. Chubb also asserts that Mrs. Levy has inadequately briefed this point under Texas Rule of Appellate Procedure 38.1.

A trial court's lack of subject matter jurisdiction is fundamental error and must be noted and reviewed by an appellate court any time it appears. *Rogers v. Clinton*, 794 S.W.2d 9, 11 (Tex.1990). Whether subject matter jurisdiction exists is a question of law subject to *de novo* review. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998).

**\*3** Appellees urged during trial that the probate court lacked subject matter jurisdiction under sections 5A(e) or 5A(b) of the Texas Probate Code because this suit is neither "appertaining to" nor "incident to" Dr. Levy's estate. Specifically, appellees argued that Dr. Levy's estate did not own the policy and Mrs. Levy sought no relief on behalf of the estate.

The Texas Probate Code provides that a "statutory probate court has concurrent jurisdiction with the district court in all actions ... by or against a person in the person's capacity as a personal representative...." TEX.PROB.CODE ANN. § 5A(c)(1) (Vernon Supp.2000). Mrs. Levy filed this suit individually and in her capacity as independent executrix of her deceased husband's estate. Therefore, according to section 5A(c), the probate court had concurrent jurisdiction with the district court over this case. *See id.* Moreover, under section 5A(b), if jurisdiction is concurrent and involves a matter appertaining to or incident to an estate, the suit "shall be brought in a statutory probate court...." § 5A(b). "In proceedings in the statutory probate courts and district courts, the phrases 'appertaining to estates' and 'incident to an estate' in this Code include ... all claims by or against an estate...." [4] *Id.*

3. " 'Personal representative' or 'Representative' includes *executor, independent executor,* administrator, independent administrator, temporary administrator,

together with their successors." TEX.PROB.CODE ANN. § 3(aa) (Vernon 1980 & Supp.2000) (emphasis added).

4    The Texas Probate Code, section 3(c), defines "claims" in terms of certain enumerated liabilities of a decedent and debts due the estate. *Seay v. Hall*, 677 S.W.2d 19, 23 (Tex.1984). " 'Claims' include ... *debts due such estates.*" TEX.PROB.CODE ANN. § 3(c) (Vernon 1980 & Supp.2000). A debt is a "specified sum of money owing to one person from another, including not only [an] obligation of [a] debtor to pay but [the] right of [a] creditor to receive and enforce payment." BLACK'S LAW DICTIONARY 363 (5th ed.1979).

Dr. Levy's estate, through Mrs. Levy, brought claims for (1) the cost to retain estate planning experts to remedy the negative tax consequences on the estates of Dr. and Mrs. Levy, and (2) rescission and return of out-of-pocket expenses in purchasing the insurance policy. Because Dr. Levy's estate brought these claims, the claims were appertaining or incident to Dr. Levy's estate. Because the jurisdiction of the probate court was concurrent with that of a district court and the claim was appertaining or incident to Dr. Levy's estate, Mrs. Levy was required to bring the claims on behalf of her husband's estate in the probate court. *See* TEX.PROB.CODE ANN. § 5A (Vernon Supp.2000). Accordingly, we find the probate court had subject matter jurisdiction.

Mrs. Levy's first point of error is overruled.

## IV. INSURANCE POLICY INTERPRETATION
In her second point of error, Mrs. Levy asserts that the probate court erred in awarding a take-nothing judgment in favor of appellees. First, she contends that the "[p]olicy language that says, no death benefits will be paid until the death of both insureds, is ambiguous because the Levys are the only insureds and beneficiaries in the policy." Thus, she contends, because the policy is ambiguous, the probate court should have let the jury decide the identity of the intended beneficiary. Alternatively, Mrs. Levy argues the policy is unambiguous, entitling her to the death benefits as the sole surviving beneficiary. Central to Mrs. Levy's contract interpretation arguments are the erroneous assumptions that (1) the July 16th *application* designating Dr. and Mrs. Levy as beneficiaries constituted the "in force" insurance policy, and that (2) even if the July 16th application were the policy "in force," the benefits are payable to Mrs. Levy as a surviving beneficiary. We disagree with both of Mrs. Levy's

interpretations.

*4 General rules of contract interpretation govern our interpretation of an insurance policy. *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex.1999). Our primary concern is to ascertain the parties' true intentions as expressed in the written instrument. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996). A written contract is not ambiguous if it is worded so that it can be given a definite or certain meaning. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). If language in an insurance policy is susceptible to two or more interpretations, then the policy language is ambiguous. *Id.*

As a threshold matter, we note that Mrs. Levy did not raise the ambiguity theory prior to or during trial and did not allege that the Chubb policy was ambiguous in any live trial pleading. Appellees argue that Mrs. Levy has not preserved for appellate review any claim of ambiguity. Absent preservation of this ambiguity claim in the record, Mrs. Levy has waived her complaint on appeal. *See Newman v. Tropical Visions, Inc.*, 891 S.W.2d 713, 720 (Tex.App.-San Antonio 1994, writ denied). Nevertheless, "[a] court may conclude that a contract is ambiguous even in the absence of such a pleading by either party." *Sage St. Assocs. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993). Mrs. Levy's waiver notwithstanding, we find the policy is unambiguous.

### A. Lack of Ambiguity in Insurance Policy Language
The Chubb policy, entitled "Joint and Last Survivor Flexible Premium Adjustable Life Insurance Policy-Survivorship Life" is clear and easy to read. It is a "second-to-die" policy. The cover page of the Chubb policy expressly states:

> Chubb Life Insurance Company of America, a Stock Company, will pay the Death Benefits specified on page 10 to the Beneficiary on the death of the surviving Insured on receipt of due proof of both Insureds' deaths while this policy was in force.

The cover page also contains the following information:

Adjustable Death Benefit Payable On The Death Of The Survivor Of The Insureds.

No Death Benefit Payable On The Death Of The First Insured Unless Provided For By Rider.

There was never any discussion between Mrs. Levy and Mr. Hunt about the inclusion of a rider to the Chubb policy. The policy brochure that Mr. Hunt delivered to Mrs. Levy at their July 1996 meeting, explaining the terms of the policy, clearly states that the Levys were not eligible for a rider that would pay any death benefit on the death of the first insured because the Levys exceeded the maximum age allowed for such a rider.

The term "benefit" is defined on page 5 of the Chubb policy, as follows:

> The amount payable on the death of the surviving Insured while this policy is in force. It is explained fully in the Death Benefit section.

The section entitled "Death Benefit" on page 10, clearly states:

> Death Benefit-If the survivor of the Insureds dies while this policy is in force, we will pay the Death Benefit proceeds upon receipt of due proof of the death of both Insureds. No Death Benefit is paid on the first death of the joint Insureds. The Death Benefit proceeds are also subject to all other terms and conditions of this policy.

*5 The Chubb policy is not ambiguous. It is clearly a "second-to-die" policy with benefits payable to the designated beneficiary, Rebecca Klaven, on the death of the second of the named insureds to die. There was no valid, binding insurance contract between the Levys and Chubb until all conditions precedent had been satisfied. Those conditions precedent were satisfied and the policy became effective and "in force" on September 4, 1996, when (1) the policy application amendment (changing the beneficiary to the daughter) was signed; (2) the initial premium was paid; and (3) the policy was delivered to the Levys.

Chubb refused to underwrite the policy based on the application that purported to designate Dr. and Mrs. Levy as both the insureds and the beneficiaries. Mrs. Levy knew of Chubb's refusal before she paid the first insurance premium. Moreover, the sixth page of the insurance agreement explicitly provides that "[t]here is no insurance until the initial premium is paid.... The coverage begins on the Policy Date, *provided that the initial premium has been paid ....* " Clearly, the original policy

application the Levys signed in July 1996 did not form the "in force" insurance policy with Chubb.

The policy was placed "in force" on September 4, 1996. Rebecca Klaven was the only beneficiary under the policy on that date. Mrs. Levy was never a beneficiary of the Chubb policy.

Mrs. Levy requested the trial court to submit a jury question as to whether there was an agreement that the proceeds of the insurance policy would be paid to Mrs. Levy on the death of her husband and whether Chubb breached the insurance contract. The court refused to do so. Mrs. Levy claims she is entitled to a reversal and remand for a new trial because the trial court denied submission of these jury questions. We disagree.

If the contract is unambiguous, the court must enforce the contract as written. *Crown Constr. Co., Inc. v. Huddleston,* 961 S.W.2d 552, 556 (Tex.App.-San Antonio 1997, no pet.) (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996)). If a contract is ambiguous, then interpretation of the contract presents a fact issue for the jury. *Id.* A trial court errs when it does not construe an unambiguous provision as a matter of law, and instead, submits the issue to a fact finder. *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W.3d 658, 665 (Tex.App.-Houston [1st Dist.] 2000, no pet. h.); *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.,* 955 S.W.2d 286, 290 (Tex.App.-Houston [1st Dist.] 1997, writ denied). The disputed policy language is not reasonably susceptible to more than one meaning and therefore is unambiguous. *See Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex.2000). Because we find that the insurance policy was unambiguous, we hold that the trial court did not err in refusing to submit Mrs. Levy's policy interpretation questions to the jury.

**B. Validity of Amendment Application**
*6 Mrs. Levy further asserts that the amendment changing the beneficiary designation to her daughter was ineffective because (1) the amendment form states that both insureds must sign both copies of the amendment, yet (a) the amendment was unsigned; (b) a documents expert testified that Dr. Levy's signature was invalid; and (c) Mrs. Levy now claims that she did not change the beneficiary to her daughter; (2) the purported amendment was not included as part of the policy; and (3) the purported amendment is merely parol evidence which cannot modify an agreement encompassing the "entire contract" between the parties. These arguments have no merit.

"The real inquiry which a court must make in determining whether a party has signed a contract, is to determine whether he, or someone else at his direction, placed a marking thereon with the intention to give vitality to the instrument." *Lebow v. Weiner,* 420 S.W.2d 755, 758 (Tex.Civ.App.-Houston [14th Dist.] 1967, no writ). Mr. Hunt testified that after signing the application amendment, Mrs. Levy left the room in order to obtain Dr. Levy's signature on the amendment. When she returned, the amendment appeared to have Dr. Levy's signature on it. Moreover, while Mrs. Levy could neither admit nor deny signing her husband's name to this amendment, she admitted having signed her husband's name on various documents in the past. The jury could have found, for example, that Mrs. Levy signed her husband's name by permission. This finding is consistent with the expert's testimony that the signature was not that of Dr. Levy's. In addition, the record in this case does not support Mrs. Levy's assertion that she did not change the beneficiary to her daughter. The record shows Mrs. Levy's signature on the amendment to the application; Mrs. Levy's own handwriting expert testified this signature was authentic; and Mr. Hunt testified that he saw Mrs. Levy sign the amendment.

Moreover, the amendment to the application provides that "The Proposed Insured ... must sign *both* copies of this amendment before delivery of this policy. Return first copy, properly signed, to the Home Office." Mrs. Levy cites no authority, nor are we aware of any which would support her proposition that *both* copies of an amendment to the application must be signed before the policy becomes *effective.* The statement on the application amendment appears to be nothing more than a directive for the agent to have both copies signed for some internal record-keeping purpose at the "home office," such as retaining and filing a signed copy of all policies and related documents.

Mrs. Levy points out that the insurance policy provides:

> This policy is a legal contract.... The entire contract consists of:
>
> (1) this policy form; and
>
> (2) riders, if any, which add benefits to the basic policy; and
>
> (3) endorsements, if any; and
> (4) your application, and any amendments or supplemental applications *all of which are added to and made a part of the policy.*[5]

5     Emphasis added.

**\*7** Mrs. Levy interprets this provision as requiring the physical addition, or attachment, of any amendments to the policy. However, we interpret the "added to and made a part of" language of this provision as instead deeming that the application, the policy form, and the amendment comprise the insurance agreement, regardless of their physical attachment to one another. This interpretation is consistent with long standing contract law which provides that a contract may be composed of several documents which must be construed as a single, unified instrument. *Bristol Myers Squibb Co. v. Barner,* 964 S.W.2d 299, 302 (Tex.App.-Corpus Christi 1998, no pet.); *see, e.g., Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.,* 150 Tex. 258, 239 S.W.2d 803, 809 (1951) (holding that multiple insurance policies, endorsements attached to the policies, a pension trust agreement, and a fully executed commitment letter were all part of the same transaction and should be construed together).

In a related assertion, Mrs. Levy argues that the "signed amendment is parol evidence because it was not included as part of the Policy." This argument fails for at least two reasons: (1) as discussed above, amendments *are* part of the policy; and (2) a court may consider the verbal agreements alleged to have been made subsequent to the original written contract without violating the parol evidence rule. *Digby v. Tex. Bank,* 943 S.W.2d 914, 928 (Tex.App.-El Paso 1997, writ denied). In the absence of an integrated written agreement, the rule serves only to exclude evidence of agreements made prior to or contemporaneously with a writing, not subsequent modifications. *Id.* Here, the amendment was dated and signed after the application and policy forms were signed and, therefore, the parol evidence rule would not bar consideration of them. *See id.* Moreover, we find no indication that the July 16th application was intended to represent a final, integrated agreement between the parties. The policy form clearly contemplates that certain other documents may be executed. It states on its face that the "entire contract consists of this policy form; and riders ... which add benefits to the basic policy; and ... any amendments or supplemental applications."

## C. Incontestability
Mrs. Levy also contends that Chubb cannot contest this policy because of the mandatory incontestability provision[6] in this policy which states:

[6]     *See* TEX.INS.CODE ANN. art. 3.44(3) (Vernon 1981 & Supp.2000).

We will not contest this policy, except for any increase in the Specified Amount, after it has been in force during the lifetime of each Insured for a period of two years from its Issue Date.

Mrs. Levy has misconstrued the effect of an incontestability clause. "If plaintiff's right to recover upon a policy of life insurance is dependent upon a condition precedent, the insurer's insistence upon its non-liability does not constitute a contest of the policy under the incontestability clause." *Lee v. Universal Life Ins. Co.*, 420 S.W.2d 222, 226 (Tex.Civ.App.-Houston [14th Dist.] 1967, writ ref'd n.r.e.). By the incontestability provision the "insurer is prohibited from contesting the validity of the policy, from abrogating it, from avoiding it, from escaping the liability fixed by its terms upon the insurer.... The insurer is standing upon the letter and spirit of the contract as written; is seeking to uphold, and not defeat, the contract.... In short, the insurer is not 'contesting' the policy at all, but is asserting its validity in both form and substance, and the provision of incontestability is inapplicable." *Id.* (quoting *Howard v. Mo. State Life Ins. Co.*, 289 S.W. 114, 115 (Tex.Civ.App.-San Antonio 1926, writ ref'd)).

*8 There is a distinction between contesting the validity of an insurance contract and contesting its coverage, meaning or application. Here, Chubb is not contesting the validity of the policy it issued; rather, it is insisting upon observance of the policy terms. This is not a contest of the policy within the meaning of the incontestable clause. *See Great Am. Reserve Ins. Co. v. Fry*, 418 S.W.2d 716, 719 (Tex.Civ.App.-Austin 1967, writ ref'd n.r.e.).

Accordingly, Mrs. Levy's second point of error is overruled.

## V. CONCLUSION

The probate court had subject matter jurisdiction over the claims asserted in this case. Moreover, the trial court did not err in any of the rulings Mrs. Levy challenges in her points of error. The amendment to the application for the "second-to-die" insurance policy changing the primary beneficiary designation to the Levys' daughter, Rebecca Klavan was effective and became part of the policy "in force." Under the terms of the policy itself, there was no coverage to *anyone* until Rebecca Klaven was named as the beneficiary, payment of the premium was made, and the policy delivered to Mrs. Levy on September 4, 1996. Once these conditions precedent were satisfied and the policy was "in force," benefits became payable only to Rebecca Klavan and only after the deaths of both Dr. and Mrs. Levy.

The judgment of the trial court is affirmed.

End of Document                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

4831-9504-5921, v. 1


**TAB 6**

1998 WL 787558
Only the Westlaw citation is currently available.

NOTICE: NOT DESIGNATED FOR PUBLICATION.
UNDER TX R RAP RULE 47.7, UNPUBLISHED
OPINIONS HAVE NO PRECEDENTIAL VALUE
BUT MAY BE CITED WITH THE NOTATION "(not
designated for publication)."

Court of Appeals of Texas, Houston (14th Dist.).

Donna BALLARD, Appellant
v.
Mary QUINN, Appellee

No. 14-97-01057-CV. | Sept. 10, 1998.

On Appeal from the 295 [th] District Court Harris County,
Texas Trial Court, No. 96-01482.

Panel consists of Chief Justice MURPHY and Justices
HUDSON and O'NEILL.

## OPINION

ONEILL, J.

*1 This appeal involves the construction of section
171.255(a) of the Tax Code, which imposes personal
liability upon officers and directors for corporate debts
incurred after corporate privileges are forfeited. See TEX.
TAX CODE ANN. § 171.255(a) (Vernon 1992). Donna
Ballard ("Ballard") appeals from a judgment entered in
favor of Mary Quinn ("Quinn") holding Ballard
personally liable as a director for the corporation's debt.
Finding that the debt here sued upon related back to the
pre-forfeiture obligation and was thus not "created" or
"incurred" after forfeiture of the corporate charter within
the meaning of the statute, we reverse and render
judgment in favor of Ballard.

## Background

On October 15, 1991, Ballard's Professional Pest Control,
Inc. (hereinafter "the corporation") performed a termite

inspection upon which Quinn and her husband relied in
purchasing a home. Upon moving into the house,
however, they discovered numerous defects, including
infestation of roaches, mice and bees. Quinn filed suit
against the corporation, among others, claiming that it had
performed a negligent inspection of the home. Quinn
settled with the other defendants prior to trial. When the
corporation failed to appear for trial, the trial court
granted a default judgment in Quinn's favor. Because the
corporation had forfeited its corporate privileges for
failure to pay taxes prior to entry of the judgment, Quinn
brought this suit against Ballard, an officer of the
corporation, seeking to impose personal liability on her
for the judgment against the corporation pursuant to
section 171.255 of the Tax Code. Following a bench trial,
the trial court concluded that the debt sued upon was
incurred after forfeiture of the corporation's charter
within the meaning of the statute and entered judgment in
favor of Quinn. The court's construction of the statute
forms the basis of this appeal.

The construction of a statute presents a question of law
for the court. See Johnson v. City of Fort Worth, 774
S.W.2d 653, 656 (Tex.1989). On appeal, this court
reviews questions of law de novo. See City of Pearland v.
Alexander, 483 S.W.2d 244, 249 (Tex.1972).

### Point of Error One

In her first point of error, Ballard claims the trial court
erred in its determination that the debt sued upon was
created or incurred by the corporation after its charter was
forfeited, and thus imposing personal liability against her
as an officer of the corporation under section 171.255(a)
of the Tax Code. That section provides:

> If the corporate privileges of a
> corporation are forfeited for the
> failure to file a report or pay a
> tax or penalty, each director or
> officer of the corporation is
> liable for each *debt of the
> corporation that is created or
> incurred* in this state after the
> date on which the report, tax, or
> penalty is due and before the
> corporate privileges are revived.

TEX. TAX CODE ANN. § 171.255(a) (Vernon
1992).(emphasis added). The definition of "debt" for

purposes of the statute refers ordinarily to a liquidated sum of money that is legally enforceable by the creditor. *See Schwab v. Schlumberger Well Surveying Corp.,* 145 Tex. 379, 198 S.W.2d 79, 81 (1946). "Debt" has generally been defined as "a specified sum of money owing from one person to another including not only an obligation of a debtor to pay but the right of a creditor to receive and enforce payment." *Rogers v. Adler,* 696 S.W.2d 674, 676 (Tex. App-Dallas 1985, writ ref'd n.r.e.) (quoting *Seay v. Hall,* 677 S.W.2d 19, 23 (Tex.1984)); *see* BLACK'S LAW DICTIONARY 363 (5th ed.1979). For purposes of the tax code, "debt" is "any legally enforceable obligation measured in a certain amount of money which must be performed or paid within an ascertainable period of time or on demand." TEX. TAX CODE ANN. § 171.109(a)(3). Because section 171.109(a)(3)'s definition applies throughout Chapter 171 of the Tax Code, it applies to section 171.255(a). *See Cain v. State,* 882 S.W.2d 515, 516 (Tex.App. - Austin 1994, no writ). Thus, the term "debt" as used in section 171.255(a) "has never been thought to include an obligation that is unliquidated." *Id.* at 519. Instead, "the word 'debt' carries a narrow, restricted meaning of a *liquidated* money obligation that is legally enforceable...." *Id.* at 517.

**\*2** Under the foregoing definition, the "debt" in the present case refers to the trial court's default judgment against the corporation liquidating Quinn's alleged damages, which occurred after the corporation's charter was forfeited. *See id.* However, a determination of what constitutes the "debt" is only the first step in the analysis. We must next determine when, under the facts and circumstances shown by the record, the obligations evidenced by the debt were "created" or "incurred." *See Curry Auto Leasing, Inc. v. Byrd,* 683 S.W.2d 109, 112 (Tex.App.-Dallas 1984, no writ) (citation omitted).

Although remedial, section 171.155(a) is also penal in nature and, as such, must be strictly construed. *See Schwab,* 198 S.W.2d at 81; *Cain,* 882 S.W.2d at 517; *River Oaks Shopping Center v. Pagan,* 712 S.W.2d 190, 192 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.). Liability of officers and directors of a corporation is provided thereunder only for debts "created" or "incurred" after forfeiture of corporate privileges, that is, when an obligation that did not exist before is brought into existence. *See id.* This definition is broad enough to include debts brought into existence by an act of omission. *See Serna v. State,* 877 S.W.2d 516, 519 (Tex.App.-Austin 1994, writ denied). Individual liability is imposed only for debts contracted *after* the forfeiture of the right to do business, and has no application to obligations arising or renewed prior thereto. *See River Oaks Shopping Center,* 712 S.W.2d at 191-92. As stated

in *Curry Auto Leasing, Inc.:*

> When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions relate back to and are authorized at the time of execution of the contract.

683 S.W.2d at 112.

In the present case, the conduct creating the debt occurred when the corporation performed the negligent termite inspection, nearly two years prior to forfeiture of its charter. The inspection was authorized and performed pursuant to the agreement between the parties culminating in the corporation's preparation of the "Texas Official Wood Destroying Insect Report," upon which Quinn relied in purchasing the home. The work performed under the agreement had long since been completed before corporate privileges were forfeited. Because the conduct which created or incurred the debt occurred prior to forfeiture of corporate privileges and arose out performance of the termite inspection agreement, Ballard may not be held personally liable under the statute.

Quinn contends the foregoing authorities do not apply to the facts and circumstances of this case because her claims sound in tort rather than in contract. However, such a distinction is one without a difference under the facts presented, and has been specifically rejected by other courts. *See Rogers,* 696 S.W.2d at 676-77. This is because the premise of Quinn's argument is not that her claim sounds in tort, but that no debt existed until her claim was reduced to judgment. *See id.* at 677. Moreover, it appears that the claims asserted by Quinn in the underlying suit necessarily related back to and arose out of the contract for termite inspection services. *See id.* Strict construction of the statute prohibits the imposition of liability in the present case where all of the operative facts occurred nearly two years before the corporate charter was forfeited and related back to the termite inspection agreement. "The mere fact that the amount of money owed ... as damages was unspecified at the time of the forfeiture does not establish that the debt was created or incurred after forfeiture." *Id.* at 677.

**\*3** Quinn relies on a series of cases imposing administrative penalties against corporate officers and directors for the corporation's continued failure after forfeiture to plug abandoned wells, which is statutorily required. *See State v. Triax Oil & Gas, Inc.,* 966 S.W.2d

123, 126 (Tex.App.-Austin 1998, no writ); *Jonnet v. State,* 877 S.W.2d 520, 528-29 (Tex.App.-Austin 1994, writ denied) (Powers, J., concurring); *Serna,* 877 S.W.2d at 519; *Cain,* 882 S.W.2d at 519. According to Quinn, these cases "determine once and for all that for non-contractual cases, construction of section 171.255 turns on whether the debt at the time of forfeiture is liquidated." We disagree, Although the Austin court found, as we have, that "debt" means a liquidated obligation, the focus of its inquiry was on whether the debt was "created" post-forfeiture for purposes of the statute. *See Triax Oil & Gas, Inc.,* 966 S.W.2d at 126; *Cain,* 882 S.W.2d at 516; *Jonnet,* 877 S.W.2d at 523; *Serna,* 877 S.W.2d at 519. Examining the purpose of the relation-back doctrine, which is "to give effect to the parties' lawful intentions, preserve rights that would otherwise be lost, or afford a remedy when none would otherwise exist," the court determined that its application in the regulatory context presented was not justified. *Cain,* 882 S.W.2d at 518. The court found that the debts created by the penalties imposed under the Natural Resources Code differ from contractual obligations in that, under the statutory scheme, (1) the operator has a continuing obligation to plug the wells, and each passing day creates an additional violation and additional fine, and (2) the penalty imposed is permissive, thus no debt exists until the agency files suit to impose the fine. *See Serna,* 877 S.W.2d at 519. Because the operator's obligations were ongoing and the penalties were "incurred" when the agency filed suit to collect the fine, all of which were post-forfeiture events, the court determined that the officers and directors could not utilize the equitable principles behind the relation-back doctrine to somehow connect the post-forfeiture debt to a pre-forfeiture event. *See id.; Cain,* 892 S.W.2d at 518. We do not find these cases analogous to the facts and circumstances of the present case, and decline to apply them in this context.

Point of error one is sustained. Due to our disposition of this point of error, we do not address Ballard's second point pertaining to the trial court's application of settlement credits.

Accordingly, the judgment of the court below is reversed and judgment is rendered in favor of Ballard.

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

4819-9082-2177, v. 1